IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Edward O. McAbee, ) | |
| ) | C/A No. 3:03-2373-MBS |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Boykin Rose, M.E. Kelly, Robert ) | **OPINION AND ORDER** |
| Gambrell, Michael Gardner, and ) | |
| South Carolina Department of Public ) | |
| Safety, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

    Plaintiff Edward O. McAbee is a former employee of the South Carolina Department of Public Safety (SCDPS), where he was a trooper for the South Carolina Highway Patrol, a division of SCDPS. At the time of filing of the complaint, Defendant Boykin Rose was director of SCDPS; Defendant M.E. Kelly was a colonel in charge of the Highway Patrol; Defendant Robert Gambrell was a sergeant with the Highway Patrol and Plaintiff's former immediate supervisor; Defendant Michael Gardner was a captain with the Highway Patrol; and SCDPS was an agency of the State of South Carolina.[1]

    Plaintiff brings the within action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to free speech under the First Amendment. Plaintiff also asserts state law claims for civil conspiracy and breach of S.C. Code Ann. § 16-17-560, which makes it unlawful to

---

[1] Plaintiff originally named as Defendants a number of members of the South Carolina Troopers Association. These Defendants were dismissed by consent order filed May 4, 2005.

discharge a citizen from employment because of "political opinions or the exercise of political rights and privileges . . . ."

The matter is before the court on motion for summary judgment filed by Defendants Rose, Kelley, and SCDPS on March 18, 2005; and on motion for summary judgment filed by Defendants Gambrell and Gardner on March 22, 2005. Plaintiff filed a memorandum in opposition to both motions on April 25, 2005. Defendants Rose, Kelley, and SCDPS filed a reply to Plaintiff's memorandum on May 2, 2005. Defendants Gambrell and Gardner filed a reply to Plaintiff's memorandum on May 13, 2005. The matter came before the court for a hearing on June 22, 2005.

The court has reviewed the pleadings, motions, memoranda, depositions, and other exhibits submitted by the parties. The court concludes that Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claim. The court declines to exercise jurisdiction over Plaintiff's remaining state law causes of action.

## I. FACTS

Plaintiff began working for the highway patrol as a trooper in 1990. Deposition of Edward O. McAbee, p. 13. He advanced to the position of lance corporal and was assigned additional duties as community relations officer, background investigator, and child safety seat technician. Id. pp. 18-20.

According to Plaintiff, state troopers are subject to a ticket quota policy. Id. 68. Plaintiff contends Defendant Gambrell wanted troopers to issue at least seventy tickets and a hundred warnings per month. Id. The ticket quota policy was pushed by Defendants Kelley, Gardner, and Gambrell. Id. pp. 70-78. Plaintiff believes in writing good quality tickets; he "used to give everybody a good bit over the speed limit too before [he] would write them a ticket." Id. p. 75.

Plaintiff had no problem writing a high number of tickets when he first began working as a trooper. Id. p. 79. He noticed "they cared about numbers . . . when they started assigning me all these extra assignments and they still . . . wanted the same numbers." Id. p. 80. Plaintiff would do all the "other stuff that [he had been assigned] for the highway patrol and then at the end of the month they're wanting to know how come [his] activity is not good." Id. Gambrell counseled Plaintiff about writing more tickets. Id. p. 80; see also pp. 238-39.

Plaintiff contends that there are other methods of ensuring a trooper performs a minimum amount of work in a month. Id. pp. 82-84. Plaintiff's belief is that a warning ticket for a traffic violation avoids "a bad taste in [the driver's] mouth for the highway patrol and the state in general" although a traffic ticket may have a more deterrent effect. Id. p. 85. Troopers are not instructed to write illegal tickets. Id. p. 83. However, Plaintiff believes the quota system "encourages writing frivolous tickets out there to have high numbers." Id. p. 82. He alleges that troopers who write more tickets were treated more favorably. Id. p. 81.

Plaintiff complained about the policy to his various supervisors. He told Defendant Kelley:

> how the situation is really bad, how many tickets they're wanting during the Labor Day holiday period for example. They always give you a bigger number during the holiday period, pushes they call it . . . . [Plaintiff] told him about things like being written like failure to sign registration cards, . . . tickets like that are . . . another joke and a slap in the face to whoever gets a ticket for failing not sign a registration along with a speeding ticket, a seat belt ticket and whatever else they throw in the hat.

Id. p. 70. Plaintiff asserts that "every supervisor I've ever had that's always been a topic of conversation. Talked with Colonel Roarke about it and Colonel Kelley about it." Id. p. 89.

In 2001, Plaintiff applied for a promotion to a corporal's position. Id., p. 35. On or about August 21, 2001, Plaintiff approached Defendant Gambrell at the Pickens County patrol office. Id.

Plaintiff said "something to the effect I had a credit card and said how much is this corporal's position going to cost me, something to that effect." Id. Plaintiff testified in his deposition that he and Gambrell both laughed about the comment. Id.

According to Plaintiff, no further discussion took place regarding the credit card incident until December 2001 when Plaintiff was elected president of the South Carolina Troopers Association. Plaintiff had pledged to the members that he would try to stop the ticket quota with the administration. Id. p. 108. Plaintiff contends that, once he was elected to president, "it seems like everybody got together and pushed me on out the door." Id. p. 149. It appears that Defendant Gambrell reported the promotion incident to his supervisor, Defendant Gardner. The matter then was relayed to the Office of Professional Responsibility (OPR) for investigation. Id. p. 50. Plaintiff asserts that Defendant Kelley "did push the OPR investigation after I was elected president of the Troopers Association which seems awfully suspicious to me." Id. p. 112.

During the investigation, Plaintiff did not deny that he had offered his credit card and made the comment to Defendant Gambrell. Plaintiff contended, however, that Defendant Gambrell "could not have taken me seriously. I feel this complaint was directed at me because Sgt. Gambrell was mad at me for not writing enough tickets." Id. p. 146, Exh. 2. OPR determined that Plaintiff had acted improperly, and on March 29, 2002, Plaintiff was terminated for improper conduct. Id. p. 52, Exh. 3. Plaintiff grieved his termination. He was reinstated on July 1, 2002 and his discipline was reduced to a reprimand. Id. Exh. 4. On August 30, 2002, Plaintiff resigned from SCDPS, asserting, among other things, that he could "no longer bear the stress of working for an agency that has a ticket quota policy." Id. Exh. 5.

Plaintiff contends that the real reason for his discharge was his stand against the ticket quota system, and not the credit card incident. Id. p. 111. According to Plaintiff,

> I would contend that [the alleged bribe incident] was a total joke and [I] should not have been terminated for something like that. I feel there is something behind the scenes there the reason I was terminated and it's probably – one of the main reasons I was opposing the ticket quota that's been going on for a long time and been hitting really hard lately and I opposed the quota when I was running for the office of president and Colonel [Kelley] knew I was going to go public with it if they didn't do something about it. So I'm thinking there's underlying problems. You don't fire somebody for joking about a promotional system.

Id. p. 52.

## II.  DISCUSSION

Defendants raise qualified immunity as a defense. Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Saucier v. Katz, 533 U.S. 194, 200 (2001). A court required to rule upon qualified immunity must consider the threshold question whether, taken in the light most favorable to the party asserting the injury, the facts alleged must show the officer's conduct violated a constitutional right. Id. at 201. If this initial question is answered affirmatively, the next sequential step is to ask whether the right was clearly established in light of the specific context of the case at the time of the violation and "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. However, if no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. Id.

In this case, Plaintiff contends that he was discharged for exercising his rights under the First Amendment. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. 1. "The First Amendment right to free speech includes not only the affirmative right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000) (citing cases). The First Amendment protects public employees, such as Plaintiff, from termination of their employment in retaliation for their exercise of speech on matters of public concern. "Because of the nature of the interest protected, however, public employee speech about matters of personal interest are not so protected. Thus, '[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment.'" McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998) (quoting Stroman v. Colleton Co. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1991)). Further, First Amendment protection of speech on matters of public concern "is not absolute and must be tempered by the government's interest in governmental effectiveness, order, and the avoidance of disruption. As an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies." Id. (citing Connick v. Myers, 461 U.S. 138, 142 (1983)). Thus, the court must balance "'the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. (quoting Pickering, 391 U.S. at 568).

Assuming for purposes of analysis only that Plaintiff was terminated because of his vocal opposition to the ticket quota system, the question presented is whether Plaintiff's speech in

6

opposition to the ticket quota system addresses a matter of public concern. The court must determine this issue based upon "the content, form, and context of [the] statement[s], as revealed by the whole record." Connick, 461 U.S. at 147-48. In the court's view, Plaintiff's criticism of SCDPS's purported ticket quota policy comprised a matter of solely personal interest regarding the manner in which his job should be performed. As may be discerned from the record, Plaintiff's personal opinion was that he should be free to issue as many or as few tickets during the month as he considered appropriate. Plaintiff complained that the ticket quota system was unfair as applied to him because he had undertaken other duties for SCDPS and his time patrolling the roadways was limited. Plaintiff admitted in his deposition that the ticket quota system personally affected him. Deposition of Edward O. McAbee, p. 88. In addition, he felt it was his duty as a representative of the Troopers Association to express the complaints of other troopers regarding the ticket policy. Id. pp. 88-89. He wished to improve working conditions for himself and other troopers. Id. pp. 89, 103. Plaintiff asserted that "there's guys with a lot of other assignments out there that are still expected to produce a lot of tickets also and that's impossible to do when you're spending a whole month of complete background investigations or either answering news media calls and meeting News Channel 4 somewhere at a wreck scene and things like that." Id. p. 163.

These are complaints regarding Plaintiff's conditions of employment. Plaintiff did not seek to inform the public regarding the ticket quota system; rather, he pursued his complaints with SCDPS internally both as an employee and as a representative of the Troopers Association. Plaintiff was not urged to write illegal tickets or otherwise undertake fraudulent activity that would reflect on the integrity of SCDPS–issues that clearly would constitute matters about which the public should be interested. The content, form, and context of Plaintiff's expression support a finding that the

speech was a matter of personal, not public, concern. Therefore, Plaintiff's comments regarding the alleged ticket quotas is not expression that is subject to protection under the First Amendment.

Even if the court were to find that Plaintiff's remarks addressed a matter of public concern, he could not prevail. When balancing the interests of Plaintiff in commenting upon matters of public concern against the interests of SCDPS, as an employer, the court must consider "'the nature of the employee's job . . . [and the] possible effect of his action on employee morale, discipline, or efficiency.'" Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (quoting Jurgensen v. Fairfax Co., 745 F.2d 868, 880 (4th Cir. 1984)). Law enforcement officers are particularly subject to having rights restricted because they are "paramilitary" – discipline is demanded, and freedom must correspondingly be denied. Id. (citing Hughes v. Whitmer, 714 F.2d 1407, 1418 (8th Cir. 1983)). Thus, law enforcement officials are afforded greater latitude in dealing with dissension in their ranks. Id. (citing Hughes, 714 F.2d at 1419).

In the court's view, the potential that Plaintiff's speech could have a negative impact on the morale, discipline, or efficiency of other troopers is self-evident. The court concludes that SCDPS's interest in maintaining discipline among state troopers outweighs any First Amendment rights Plaintiff possesses with respect to speech regarding the ticket quota policy.

Because Plaintiff has failed to allege the deprivation of a constitutional right, the court need not move to the next sequential step of asking whether the right was clearly established in light of the specific context of the case at the time of the violation and "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201. Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claim.

III. CONCLUSION

For the reasons stated, Defendants' motions for summary judgment on the grounds of qualified immunity are **granted**. The court declines to address Plaintiff's state law claims. Plaintiff may reallege his civil conspiracy claim and claim pursuant to S.C. Code Ann. § 16-17-560 in state court within thirty days as provided by 28 U.S.C. § 1367(d).

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
United States District Court

Columbia, South Carolina

January 31, 2006